[Civ. No. 37407. Second Dist., Div. Two. Feb. 26, 1971.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
GEORGE EDWARD HOLMES, Real Party in Interest.

**COUNSEL**

Evelle J. Younger, District Attorney, Harry Wood and Arnold T. Guminski, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

George Edward Holmes, in pro. per., for Real Party in Interest.

**OPINION**

**HERNDON, Acting P. J.**—This is a petition for a writ of mandate under section 1538.5 of the Penal Code, to require respondent superior court to annul that portion of its order which suppressed evidence in a criminal prosecution against the real party in interest, George Edward Holmes.

*Statement of the Facts*

On October 10, 1969, at approximately 5:30 a.m, Deputy Sheriff Jacobs and his partner, while patrolling in the vicinity of 118th Street and Willowbrook Avenue in Los Angeles County, responded to a radio call to assist a detective unit in a "shots-fired" situation. Upon arrival at the location of the detective unit, the detectives were talking with at least two persons. Jacobs and his partner circled "the block to see if there were any more suspects in the area."

About three-quarters of the way around the block the officers observed two youthful males who were staggering along the opposite side of the street and appeared to be drunk. The uniformed officers "pulled across traffic, across the traffic lane, and approached directly to the curb adjacent to them." After so doing the officers exited their marked patrol car. Jacobs' partner went to the defendant's companion, and Jacobs, the passenger in the marked patrol car, circled around behind the car to approach the defendant. When Jacobs alighted from the patrol car the defendant was about 12 paces away.

As Jacobs was leaving the vehicle, the defendant held up his left hand and said to the officer, "Hold it, hold it; wait a minute." The officer continued to advance telling defendant to keep his hands in plain view. When the

officer approached the defendant he "reached into his right rear pocket and appeared to be trying to get something out, and it was a jerking motion as though he were trying desperately to get something out of his pocket."

Jacobs thereupon grabbed for the defendant's hands, telling him to "take it easy." The officer then removed the defendant's hand from the right rear pocket, reached into the pocket and removed therefrom a .25 Wischok-Gerlangen automatic. The weapon was later determined to have been loaded with one bullet in the chamber and one bullet in the magazine.

After recovering the firearm, Jacobs placed the defendant under arrest and made a further search of him. The officer noticed a "bulge in his left jacket pocket and it was easy to see that he had a brown paper bag, and inside the paper bag quite a large number of red capsules." Deputy Jacobs could see directly into the pocket and did not have to open, move or touch it in any way. As a result of his professional training, Jacobs concluded the red capsules were seconal. The officer seized the capsules, 494 in number, which proved in fact to be seconal.

### The Trial Court's Order

The court below impliedly made the obviously required finding of fact that Officer Jacobs had probable cause to detain the defendant as indicated by the denial of the motion to suppress with respect "to the contents of the paper package that were identified as red capsules." The court also rejected defendant's claim that the discovery of the red capsules constituted a "fruit of the poisonous tree" stating:

"What you are contending is that if the search for the weapon was illegal, then the further search as the result of which the capsules were found would be a fruit of the original illegal search and therefore it would be tainted and would be illegal. . . . The trouble with it, Mr. Holmes, is that according to the only testimony we have on the subject the capsules were in plain view in your pocket, and the officer, on the basis of his experience, suspected that they were dangerous drugs, and he was justified in proceeding further to determine whether or not they were."

In the course of announcing his ruling, the trial judge clearly indicated his acceptance of the truthfulness of the officer's testimony describing the circumstances attending the officer's seizure of the gun and the package of seconal tablets. ▮ However, the court concluded that the officer's failure to pat-down the defendant before reaching into the defendant's right rear pocket and removing the firearm was illegal and impermissible. We hold that this conclusion of the trial court is mistaken and contrary to law.

*The Trial Court Erroneously Granted the Motion to Suppress With Respect to the Firearm on the Ground That the Arresting Officer Did Not Have the Right, Under the Attendant Circumstances, to Remove the Firearm From the Defendant Without First Having Engaged in a Pat-Down Procedure.*

It is clear that under the attendant circumstances Deputy Jacobs had the right to detain and question the defendant and the trial court so held. The facts clearly articulated in the officer's testimony were more than sufficient to justify the very strong suspicion that the defendant was armed and dangerous and to demonstrate the reasonableness of the officer's action in removing and seizing the firearm without first performing the ceremony of a pat-down. To require a police officer in these circumstances to conduct a pat-down before taking obviously required action to protect his own life would be contrary to every dictate of reason. As stated in *Cunha* v. *Superior Court*, 2 Cal.3d 352, 355-356 [85 Cal.Rptr. 160, 466 P.2d 704]:

■ "Circumstances short of probable cause may justify stopping a pedestrian for further investigation (*People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]), but before an officer detains an individual for questioning by means of physical force or a show of authority, he 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' (*Terry* v. *Ohio* (1968) 392 U.S. 1, 16, 19, fn. 16, 20-21 [20 L.Ed.2d 889, 902, 904, 905-906, 88 S.Ct. 1868].) ■ A pat-down is an additional intrusion, and can be justified only by specification and articulation of facts supporting a reasonable suspicion that the individual detained is armed; a further intrusion into a suspect's clothing to recover a weapon requires a similar showing of a reasonable belief that the pat-down has disclosed the presence of a weapon. (*Ibid., People* v. *Collins,* 1 Cal.3d 658, 662 [83 Cal.Rptr. 179, 463 P.2d 403].) If as a result of the detention or otherwise the officer becomes aware of circumstances which provide probable cause for arrest, he may arrest the suspect and conduct an incident search for weapons and destructible evidence. (*Chimel* v. *California* (1969) 395 U.S. 752, 763 [23 L.Ed.2d 685, 694, 89 S.Ct. 2034]; *People* v. *Mickelson, supra,* 59 Cal.2d at pp. 450-451.)"

The requirement of a pat-down search for weapons generally has been discussed in cases in which the officer only suspects upon the basis of articulable facts that the person detained may be armed. These cases generally have not involved situations in which the suspect has engaged in conduct which would lead a reasonable and prudent officer not only to suspect that the person detained is armed but also to apprehend that he is preparing and immediately threatening to use the weapon to fire upon the officer.

█ The United States Supreme Court in the cases of *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], and *Sibron* v. *New York,* 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889], approved the "pat-down" procedure and set out the proper scope of such searches. "The sole justification of the search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (*Terry* v. *Ohio, supra,* at p. 29 [20 L.Ed.2d at p. 911].)

The California Supreme Court further amplified the rules applicable to "pat-down" searches in *People* v. *Collins,* 1 Cal.3d 658, at page 662 [83 Cal.Rptr. 179, 463 P.2d 403]: "In balancing the safety of police officers against the Fourth Amendment's proscription of unreasonable intrusions, *Terry* and *Sibron* thus conclude that in searching a legally detained individual reasonably suspected of being armed, a police officer must be limited to 'a careful exploration of the outer surfaces of [the] person's clothing' (*Terry* v. *Ohio, supra,* 392 U.S. at p. 16 [20 L.Ed.2d at p. 903]) *until and unless he discovers specific and articulable facts reasonably supporting his suspicion.* Only then may an officer exceed the scope of a pat-down and reach into the suspect's clothing for the limited purpose of recovering the object thought to be a weapon. As with other searches without warrants, the burden of pointing to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' such an intrusion properly rests with the People. [Citations.]" (Italics supplied.)

In *People* v. *Todd,* 2 Cal.App.3d 389 [82 Cal.Rptr. 574], an officer stopped a vehicle driven by one Hughes for an equipment violation. Circumstances then developed which reasonably led the officer to suspect that the vehicle was stolen. Using his radio, he requested a "want" on the license plate of the stopped vehicle. He then proceeded to make a "cursory search" of Hughes. In order to do so he lifted up the back of a jacket which extended below Hughes' waist whereupon he observed a wallet in the left rear pocket of his tight-fitting blue Levis and a bulge in the right rear pocket.

When the officer proceeded to put his hand on the bulge, Hughes jerked away saying, "You cannot search me without a warrant even if I have a gun." To the officer the bulge resembled a gun and when Hughes jerked away, saying he could not be searched, the officer apprehended that he and his partner were in peril. He forced Hughes' left hand behind his back, put his hand into Hughes' right rear pocket saying, "You better not have a gun there" and retrieved what turned out to be a cigarette box with the top bent back. In the box the officer observed marijuana and plastic bags

containing what in his opinion was heroin. At pages 393-394, this court commented:

"This search began as strictly a routine pat-down search for weapons starting at the waist, until the officer observed a bulge in Hughes' right rear pocket. Based on Hughes' conduct in jerking away from the officer when the officer tried to put his hand on the bulge and his provocative statement concerning 'a gun,' and the officer's belief that the bulge resembled a gun (he had previously seen guns of the same size and shape) Officer Teague formed the opinion that the bulge was a gun and he and his partner were in peril. Having reasonable cause to believe Hughes was in possession of a weapon, the officer had the right to direct him to surrender the same to him. (*People* v. *Fry*, 271 Cal.App.2d 350, 354 [76 Cal.Rptr. 718].) Here, however, from defendant's statement 'You cannot search me without a warrant even if I have a gun,' Officer Teague could assume defendant would not deliver it to him and, for his own protection and that of Officer Sherlock, took the object from him. This, too, was proper. His good faith belief that the bulge might be a gun justified the seizure of the object even though it was not in fact a weapon. . . ."

In *People* v. *Woods*, 6 Cal.App.3d 832 [86 Cal.Rptr. 264], a police officer and his partner responded to a "shots-fired" report. After interviewing persons in the area, the officers on foot, just after 10 p.m., observed defendant, apparently a complete stranger to the officers, walking toward the intersection. He was about 100 feet south of it. Officer Convey approached the defendant from the front and his partner approached him from the rear. Convey saw that defendant's left hand was concealed in a jacket pocket. Because of the nature of the investigation, on approaching defendant, Convey placed his right hand on defendant's left hand which was still in the pocket and asked defendant what he had in the pocket. Defendant became nervous and could not answer the question. Convey reached into the pocket, placed his hand over defendant's knuckles, and pulled defendant's hand out to discover whether defendant was holding a pistol. Defendant's hand was empty. At this point, Convey, without spreading the pocket or pulling it open, shined his flashlight into the pocket and discovered therein a clear plastic bag containing a green leafy substance that looked like marijuana. Convey removed the bag from defendant's pocket and arrested him for possession of marijuana.

The court, in holding that the officer's actions were lawful, said at page 838: "This brings us to the question of whether Officer Convey, after stopping defendant, was constitutionally privileged to ascertain whether he had a weapon in the hand he had concealed in a jacket pocket by forcibly withdrawing that hand instead of by conducting a superficial·exterior pat-

down search of defendant's person, including the hand in question. We have found no authority upon this very narrow point, but as a matter of common sense we believe that he was. Officer Convey's immediate concern was the concealed hand and we think that he acted reasonably in relieving his concern at once in the manner in which he did."

In *People* v. *Atmore,* 13 Cal.App.3d 244 [91 Cal.Rptr. 311], the arresting officer saw the defendant in an area near the scene of a murder and detained him for a cursory search for offensive weapons because the defendant answered the description of the murder suspect. When defendant abruptly grabbed his jacket pocket, the officer felt what he believed to be a shotgun shell and reached into the pocket to remove it. He pulled out a marijuana cigarette and a cylindrical object that proved to be a lipstick container. In rejecting defendant's contention that his constitutional rights were violated by the officer's action in seizing the contraband found in defendant's outer pocket, this court observed at pages 247-248:

"We realize that when the officer reached into the pocket he had not yet ascertained that defendant was, indeed, in possession of a detonating device. Hindsight may suggest that, in order to combine maximum personal safety for the officer with a minimum invasion of defendant's privacy, the officer should first have ascertained what else defendant was carrying. We do not believe, however, that under the circumstances the officer was required to proceed in the coldly logical sequence which may suggest itself after the event. It appears from the record that his reaching into the pocket was almost a reflexive motion, provoked by defendant's sudden gesture toward the pocket and his own feeling of the contents. We cannot say that under all of the circumstances defendant's constitutional rights were violated."

In the case at bench, as in *Atmore,* the action of the officer in grabbing the defendant's arm and in reaching into his pocket to seize the gun was "almost a reflexive motion, provoked by defendant's sudden gesture." In this case, as in *People* v. *Woods, supra,* 6 Cal.App.3d 832, the holding is required "as a matter of common sense" that the officer's actions were reasonable and lawful. Any other course would have been foolhardy and quite possibly suicidal.

Let a peremptory writ of mandate issue directing respondent court to vacate the order under review and to enter its order denying the motion to suppress evidence.

Fleming, J., and Compton, J., concurred.